UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

**CIVIL ACTION NO. 06-38-JBC**

**GERALD BISHOP,** **PLAINTIFF,**

**V.** **MEMORANDUM OPINION AND ORDER**

**SUN LIFE ASSURANCE COMPANY OF CANADA,** **DEFENDANT.**

\* \* \* \* \* \* \* \* \* \* \*

This matter is before the court on the parties' briefs on the merits regarding the plaintiff's claim for long term disability benefits (DE 16, 17). The court, having reviewed the record and being otherwise sufficiently advised, will remand this matter to the plan administrator for reconsideration.

**I. Factual Background**

The plaintiff, Gerald Bishop, was a twenty-year employee of Prentress Services, Inc. ("Prentress"), a manufacturer of concrete components used in bridges and commercial structures. The precise nature of the plaintiff's job is disputed by the parties, but the record suggests that he performed a combination of supervisory duties and physical labor.

On July 22, 2003, the plaintiff, while working, was injured when a four-pound sledgehammer fell from a shelf and struck him in the neck as he leaned forward. AR 247, 544. The plaintiff had previously been diagnosed with disc herniation and spinal fusion stemming from a work injury in 2000. AR 360. He did not see a physician regarding his July 22 injury, however, until July 30, 2003, when he was examined by Dr. Jack Frost. AR 314-16. Dr. Frost diagnosed the

plaintiff as having sustained a contusion and allowed the plaintiff to return to work, with certain restrictions. *Id.* The plaintiff saw Dr. Frost again on August 6, 2003; this examination resulted in substantially the same diagnosis that Dr. Frost had rendered the previous week. AR 313.

The plaintiff was also examined by Dr. Warren Chumley and Sarah Cecil, Dr. Chumley's nurse practitioner, on August 19, 2003, and September 9, 2003. Dr. Chumley concluded that the plaintiff's symptoms were "suggestive of a right C7 radiculopathy" and that "a C-8 radiculopathy could not be excluded nor [could] a plexopathy be ruled out." AR 368. On September 24, 2003, the plaintiff also saw Dr. Phillip A. Tibbs, who found that the plaintiff had "cervical disc disease, but no clinical radiculopathy." AR 307.

The plaintiff stopped working at Prentress on September 12, 2003, and he filed his application for long term disability benefits on September 24, 2003. AR 247. Along with his application, the plaintiff submitted a form completed by Ms. Cecil, which indicated that the plaintiff suffered from a "slight limitation of functional capacity" and that he was restricted to lifting less than fifteen pounds. AR 249. Ms. Cecil noted, however, that a functional capacity evaluation ("FCE") would need to be performed before she could fully evaluate the plaintiff. AR 250.

In his application, the plaintiff referred to his occupation as being a "supervisor." AR 247. Similarly, Prentress referred to the plaintiff as a supervisor in a fax sent to the defendant on October 15, 2003. AR 240-46. However, in a form completed by the plaintiff on November 11, 2003, he claimed that, although

his job was classified as that of a "supervisor," the actual job tasks he performed were: "equipment operator and truck driver and lift heavy materials[;] stand on feet all day." AR 329.[1]  Perhaps in light of this conflict in the record, the defendant requested that Prentress "clarify the physical requirements of the [plaintiff's] job" on February 2, 2004.  AR 235.  After speaking with Jamie Stinson, a Prentress employee, the defendant learned that the plaintiff "is considered more of a working supervisor.  About 50-60% [of the time,] he is doing production labor and the other time is operating a crane and supervisory duties . . . ."  *Id.*  On February 3, 2004, Stinson sent a fax to the defendant stating that "Mr. Bishop performs the function of a crane operator along with supervisory responsibilities."  AR 376.  Stinson included a functional job analysis for a crane operator along with her fax, which indicated that crane operation comprised 70% of the plaintiff's job and that much of the remaining 30% consisted of general equipment maintenance.  AR 377-80.  The defendant acknowledges receiving Stinson's fax that day.  AR 235.

On February 11, 2004, the defendant informed the plaintiff that his application for benefits had been approved and that his benefits began to accrue on December 20, 2003.  AR 387-88.  On July 7, 2004, the plaintiff notified the defendant that the workers' compensation benefits he had been receiving were terminated following his independent medical evaluation ("IME") by Dr. Michael

---

[1] The plaintiff completed a similar form on November 5, 2003, in which he referred to his job title as "supervisor" but his job duties as "strip and store and loading truck."  AR 297.

Best. AR 234. The defendant requested Dr. Best's IME on July 13, 2004, and received it on July 23, 2004. *Id.* The IME revealed that, after performing an FCE on the plaintiff on May 25, 2004, Dr. Best found that Mr. Bishop showed signs of "symptom magnification and possible malingering." AR 413. Dr. Best also expressed concern regarding the plaintiff's combined use of oxycontin and lortab. *Id.* Thus, he recommended that the plaintiff's narcotic use be curtailed and that he be returned to work activities following a short course of rehabilitation. AR 416. In his IME, Dr. Best referred to the plaintiff as a "supervisor." AR 409.

On January 31, 2005, the defendant informed the plaintiff by mail that he no longer qualified for benefits pursuant to his policy. AR 536. The defendant based its decision on the results of Dr. Best's FCE and the examinations by Drs. Chumley and Tibbs, which the defendant claimed had yielded "no specific findings." AR 538. The plaintiff appealed the termination of his benefits on February 8, 2005. AR 542. Along with his notice of appeal, the plaintiff submitted a report from Dr. James Templin. Dr. Templin examined the plaintiff on January 13, 2005, and found that the plaintiff was unable to return to the type of work he performed at the time of his injury. AR 553. The plaintiff also sent the defendant reports from Dr. Fred Coates which showed that Dr. Coates had given the plaintiff a number of cervical injections in 2004 and 2005. AR 591-98, 608-12. On March 23, 2005, the plaintiff supplemented his application with records of his treatment by Dr. Ballard Wright at The Pain Treatment Center. AR 574-621. Included in these records were the results of a nerve conduction test performed on the plaintiff by

4

Dr. Wright which showed that the plaintiff had a "very severe hypoesthetic condition." AR 599.

On July 7, 2005, the defendant denied the plaintiff's appeal. AR 700-03. In the denial letter, the defendant listed plaintiff's occupation as "Strip Store Supervisor." AR 701. The defendant again relied on the results of the examinations performed by Drs. Best, Chumley, and Tibbs. In addition, the defendant referred the plaintiff's file to Dr. James L. Sarni, who opined that the plaintiff was fit to perform his previous job as a "supervisor." AR 702-03.

The plaintiff again appealed the denial of his benefits, this time including a copy of a favorable decision from the Social Security Administration regarding his application for disability insurance benefits. AR 709-16. The plaintiff also submitted a copy of Dr. Wright's records which indicated that the oxycontin he had been taking was destroyed in May of 2004. AR 724-25. On October 19, 2005, the defendant again denied the plaintiff's appeal. AR 752-53. The defendant stated that, in reaching its decision, it examined the entire claim file and also cited to a second report submitted by Dr. Sarni. AR 753. In his later analysis, Sarni reached the same conclusion that he did earlier and noted that "individuals with . . . a diagnosis [similar to the plaintiff's] remain very functional for an occupation such as a supervisor." AR 744.

At this point, the plaintiff's administrative remedies were exhausted, and he sought judicial review in this court on February 8, 2006.

**II. Standard of Review**

5

This action is a suit to recover long term disability benefits. The disability benefits plan ("Plan") at issue is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* Under ERISA, a district court analyzes the decision of the Plan administrator under either a *de novo* or an arbitrary and capricious review standard, depending on whether the Plan grants the administrator discretionary authority. *Sanford v. Harvard Indus., Inc.,* 262 F.3d 590, 596 (6th Cir. 2001).

The parties have agreed that the arbitrary and capricious standard of review is appropriate in this case. There is an inherent conflict of interest where, as here, the plan administrator both has discretion to make determinations of eligibility under the plan and funds the plan. However, that conflict does not alter the standard of review but is merely a factor to be considered in determining whether the decision was arbitrary and capricious. *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998). The court reviews the administrative record and makes findings of fact and conclusions of law accordingly. *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 619 (6th Cir. 1998). If it is possible to give a reasoned explanation for the administrative decision which is based on the evidence, then the decision is not arbitrary or capricious. *Davis v. Kentucky Fin.,* 887 F.2d 689, 693 (6th Cir. 1989).

As a threshold matter, both parties have alleged that the opinions of physicians on which the opposing party relies are tainted by bias. Specifically, the plaintiff claims that Dr. Best and Dr. Sarni, who were retained as consultants by the

plaintiff's workers' compensation insurer and the defendant, respectively, had a financial interest in finding the plaintiff to be not disabled. The defendant, in turn, claims that The Pain Treatment Center, Dr. Wright, and Dr. Templin (who was hired by the plaintiff's workers' compensation attorney) had a similar motivation to conclude that the plaintiff was disabled.

While the presence of a conflict of interest is a factor to be considered when reviewing a plan administrator's decisions, some evidence must be produced indicating how the alleged conflict affected the administrator's denial of the claimant's benefits. *Cochran v. Trans-General Life Ins. Co.*, 12 Fed. Appx. 277, 281 (6th Cir. 2001). Arguably, Drs. Best, Sarni, Wright, and Templin all had a financial stake in the plaintiff's disability (or lack thereof). *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) ("[I]f a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'"). If a conflict of interest alone were sufficient to discredit the testimony of a physician in an ERISA case, then all of these doctors – indeed, nearly all treating and consulting physicians in such actions – would be disqualified as well. However, since neither party has presented any specific evidence that the opinions of these physicians were improperly affected by their financial interests in the level of the plaintiff's disability, the court sees no need to significantly discount the value of their

opinions as a result of any possible bias.[2]

### III. Legal Analysis

*A. The Merits of the Plaintiff's Appeal*

The plaintiff presents several arguments in support of his claim that the defendant acted arbitrarily and capriciously in denying his claim for benefits. First, the plaintiff claims that the defendant improperly analyzed his ability to work as if he was a supervisor when he was, for all intents and purposes, a crane operator. Second, the plaintiff alleges that the defendant's reliance on the reports by Drs. Best and Sarni is misplaced because the defendant did not provide them with the plaintiff's full medical file. The plaintiff also asserts that he was not even able to perform under the medical restrictions Dr. Sarni recommended for a supervisor position. Finally, the plaintiff argues that Dr. Sarni's conclusions as to the job tasks that someone in the plaintiff's position "should be" able to perform are inadequate evidence of his disability.

The defendant's decision to deny the plaintiff's benefits application because he could still work as a supervisor was arbitrary and capricious. The defendant claims that its classification of the plaintiff as a supervisor was amply supported by evidence in the record. Specifically, it relied on the statements of the plaintiff, his

---

[2] In an unpublished opinion cited by the plaintiffs, this court recently rejected arguments by a disability claimant that Dr. Sarni was improperly influenced by his connections with the defendant. "[A] conflict of interest is a factor to be considered, but it does not deserve much weight given the lack of evidence demonstrating impropriety by Sun Life or Dr. Sarni." *Dozier v. Sun Life Assurance Co. of Canada*, C.A. No. 6:03-93-DCR, at 11 (E.D. Ky. Feb. 3, 2004).

employer, and his doctors that his job was properly classified as a "supervisor." These statements were contradicted, however, by the plaintiff's description of his job tasks, which consisted of equipment operation, truck driving, and lifting heavy materials. When the defendant sought clarification of the plaintiff's job requirements, Prentress confirmed that the plaintiff was primarily a crane operator and that his other duties consisted mainly of equipment maintenance. The defendant knew or should have known at that point that, although the plaintiff was officially referred to as a supervisor, he was, in effect, a physical laborer. Thus, it could no longer rely on earlier statements in which the plaintiff referred to himself as a "supervisor." In other words, the defendant was not entitled to evaluate the plaintiff's ability to work based solely on his job title, after it requested and received information clarifying that the true nature of his job was different than that title would suggest. This is, however, exactly what the defendant did, and its decision to do so was arbitrary and capricious.

The defendant also argues that, regardless of the job tasks the plaintiff performed for Prentress, the Plan policy at issue provides that the duties of an employee's occupation are defined by national, not employer-specific, standards. Therefore, it asserts that it was entitled to evaluate the plaintiff's job requirements based on the national standards for a supervisor. The policy provision at issue states as follows:

> Own Occupation means the usual and customary employment, business, trade, profession or vocation that the Employee *performed* as it is generally recognized in the national economy immediately prior

9

> to the first date Total or Partial Disability began.  Own Occupation is not limited to the job or position the employee *performed* for the Employer or performed at any specific location.

AR 20 (emphasis added).  The flaw in the defendant's argument is that this provision does not define an employee's occupation in terms of his job title.  Rather, it requires that an employee's occupation be defined in terms of the job "performed" by him, as that job is recognized in the national economy.  As previously discussed, the defendant was or should have been aware that the job the plaintiff actually performed was essentially that of a crane operator.  Thus, the defendant should have evaluated the plaintiff's ability to perform the job of a *crane operator* pursuant to national standards.  Under the defendant's reasoning, nearly any employee's ability to work could be assessed based on the duties of a supervisor, regardless of his actual job requirements, so long as his employer called him a supervisor.  The defendant's argument is contrary to the language of the Plan policy at issue and does not save its decision to terminate the plaintiff's benefits from being arbitrary and capricious.

Finally, the defendant suggests in its response to the plaintiff's brief on the merits that the plaintiff's work restrictions did not even render him unable to work as a crane operater.  DE 19, at 2-3.  The defendant, however, previously considered the plaintiff's claim for benefits in light of the job tasks of a yard supervisor, not a crane operator.  Thus, it would be inappropriate for the court to reach a conclusion on this argument when neither the parties nor their experts have had a chance to consider it.  Likewise, the court need not resolve the plaintiff's

claims regarding the defects in Dr. Best's and Dr. Sarni's reports. Since neither of these physicians rendered an opinion as to the plaintiff's ability to work as a crane operator and the court has already found the defendant's actions to be arbitrary and capricious, any ruling the court provides regarding those medical opinions is likely to be irrelevant.

*B. Remedy*

Once a court finds that an administrator has acted arbitrarily and capriciously in denying a claim for benefits, the court can either remand the case to the administrator for a renewed evaluation of the claimant's case or it can award a retroactive reinstatement of benefits. *Cook v. Liberty Life Assurance Co.*, 320 F.3d 11, 24 (1st Cir. 2003). Remand of an ERISA action seeking benefits is inappropriate "where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable." *Zervos v. Verizon New York, Inc.*, 277 F.3d 635, 648 (2d Cir. 2002) (quoting *Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 51 n.4 (2d Cir. 1996)). A retroactive grant of benefits is also permissible without remanding the case when there are no factual determinations to be made. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 715 (6th Cir. 2000). On the other hand, the remedy when a plan administrator fails to make adequate findings or to explain adequately the grounds of its decision to deny a claim for benefits is to remand the case to the administrator for further findings or explanation. *Caldwell v. Life Ins. Co. of North America,* 287 F.3d 1276, 1288 (10th Cir. 2002); *see also Bernstein v. Capitalcare,*

*Inc.*, 70 F.3d 783, 790 (4th Cir. 1995).

In this case, the defendant incorrectly determined that the plaintiff was a supervisor instead of a crane/heavy equipment operator. The administrative record it compiled and the referrals it sought from physicians were based on the mistaken belief that the plaintiff acted as a supervisor. Thus, the court cannot say, based only on conclusions that the plaintiff *could* work as a supervisor, that he *could not* work as a crane operator or that he is clearly entitled to benefits. Since the fundamental premise behind the defendant's determination was wrong, the most prudent course of action is to remand the case to the plan administrator for an evaluation of the plaintiff's ability to work as a crane operator (or its functional equivalent).[3] If it is determined on remand that the plaintiff cannot perform the job tasks of a crane operator (or its equivalent) due to his disability, he is entitled to long term benefits under the Plan.

*C. Attorney's Fees*

ERISA grants the court discretion to award reasonable attorney's fees and

---

[3]The plaintiff argues that a remand is unnecessary since even the work restrictions approved by Dr. Sarni would prevent the plaintiff from returning to his position as a crane operator. The plaintiff has argued at length, however, that Dr. Sarni's opinions are inadequate because he was not provided with all of the information he needed to make his decision and he improperly phrased his conclusions in terms of what the plaintiff should be able to do. Instead of demonstrating that remand is unwarranted, the plaintiff's arguments actually illuminate why it is appropriate. A remand to the plan administrator will allow the experts in this case to evaluate the plaintiff's entire medical file in determining whether he can work as a crane/heavy machinery operator. For these reasons, the court finds the plaintiff's argument against remand to be unpersuasive.

costs in actions brought under 29 U.S.C. § 1132.  The plaintiff has indicated that he intends to seek attorney's fees and that he will do so by separate motion.  Therefore, the court will await the plaintiff's motion for attorney's fees and expresses no opinion on the plaintiff's entitlement to attorney's fees at this time.

Accordingly,

**IT IS ORDERED** that the plaintiff's claim is **REMANDED** to the plan administrator for reconsideration in accordance with this opinion.

**IT IS FURTHER ORDERED** that the plaintiff shall submit a motion for attorney's fees to the court not later than 10 days from the date of entry of this order.  Response and reply deadlines shall run in accord with the Local Rules.

Signed on January 17, 2007

JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

13